**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| JOSEPH PAONE and MICHELLE SEELY, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WASTE CONNECTIONS, INC., THE BOARD OF DIRECTORS OF WASTE CONNECTIONS, INC., WASTE CONNECTIONS, INC. INVESTMENT COMMITTEE, and JOHN DOES 1-20, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> **CIVIL ACTION NO.:** |

**CLASS ACTION COMPLAINT**

Plaintiffs, Joseph Paone and Michelle Seely ("Plaintiffs"), by and through their attorneys, on behalf of the Waste Connections, Inc. 401(k) Profit Sharing Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Waste Connections, Inc. ("Waste Connections" or the "Company"), the Board of Directors of Waste Connections, Inc. (the "Board"), and the Waste Connections, Inc. Investment Committee (the "Committee") (collectively, the Company, the Board, and the Committee are referred to as "Defendants").

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the Plan, at 6 ("The Plan is a defined contribution plan covering employees of Waste Connections, Inc. (the Company) who are not covered by a collective-bargaining agreement or otherwise excluded and have at least 60 days of service. … The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Cir. 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at *14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "[e]stablish a prudent process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services, and "[m]onitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't

2

of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[3]

6.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

7.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

8.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

---

[2]  Available  at  https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

[3] *Id*.

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

9.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance, and failing to control the Plan's RKA costs.

10.     At all times during the Class Period, the Plan had at least five hundred million dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $512,465,024 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

11.     By 2024, the Plan had $799,348,558 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

12.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 9,318 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 11,557 participants. *See* 2024 Form 5500 for the Plan, at 2.

13.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a guaranteed investment contract (the "Voya GIC"), a group annuity insurance contract, with Voya Retirement Insurance and Annuity Company ("Voya" or "VRIAC"). The Voya GIC provided a

significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

15.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16.    Voya benefited significantly from Plan participants being invested in the Voya GIC. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Voya GIC was benefiting Voya at the expense of the participants in the Plan. The investments in the Voya GIC were held and invested by Voya, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Voya provided to the Plan were and are so low that Voya reaped a windfall on the spread.

17.    Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Voya,[5] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Voya GIC.

18.    The arrangements and transactions with Voya are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

---

[5] "Certain Plan investments are pooled separate accounts and collective trust funds managed by Voya and a fixed account managed by VRIAC thru a group annuity contract. Voya is the trustee for the Plan and VRIAC is the record keeper for the Plan; therefore, these transactions qualify as party-in-interest transactions." Auditor's Report, attached to 2024 Form 5500 for the Plan, at 10.

19.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with Voya, a party-in-interest, under which Voya received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plan. Defendants' conduct was especially egregious given that Voya received additional income from certain of the Plan's investment securities, described below.

20.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

21.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transactions (Counts III and IV).

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

24.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

#### Plaintiffs

25.     Plaintiff, Joseph Paone ("Paone"), resides in Stuyvesant, New York. During his employment, Plaintiff Paone participated in the Plan. Mr. Paone invested in the Voya GIC in the Plan and suffered injury to his Plan account due to underperformance of the Voya GIC. In addition, Plaintiff Paone also suffered injury to his Plan account by paying excessive recordkeeping costs.

26.     Plaintiff, Michelle Seely ("Seely"), resides in McKinney, Texas. During her employment, Plaintiff Seely participated in the Plan. Ms. Seely invested in the Voya GIC in the Plan and suffered injury to her Plan account due to underperformance of the Voya GIC. In addition, Plaintiff Seely also suffered injury to her Plan account by paying excessive recordkeeping costs.

27.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

28.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

#### Defendants

#### Company Defendant

7

29.     Waste Connections is the Plan sponsor and a named fiduciary with a principal place of business at 3 Waterway Square Place, The Woodlands, Texas. *See* 2024 Form 5500 of the Plan, at 1. "Waste Connections … is an integrated solid waste services company that provides non-hazardous waste collection, transfer and disposal services, including by rail, along with resource recovery primarily through recycling and renewable fuels generation. The Company serves approximately nine million residential, commercial and industrial customers in mostly exclusive and secondary markets across 46 states in the U.S. and six provinces in Canada."[6]

30.     The Plan is administered by the Waste Connections, Inc. Investment Committee (*see* SPD, at 22-23), whose members are appointed by the Company's Board of Directors. See Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6 ("The Investment Committee … reports to the Plan's Board of Directors.").

31.     Waste Connections appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Accordingly, Waste Connections during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

---

[6] *See* "Waste Connections Reports Fourth Quarter 2025 Results and Provides 2026 Outlook" February 11, 2026. Available at https://investors.wasteconnections.com/news/news-details/2026/Waste-Connections-Reports-Fourth-Quarter-2025-Results-and-Provides-2026-Outlook/default.aspx#:~:text=Waste%20Connections%20(wasteconnections.com),our%20progress%20towards%20targeted%20achievement.

33. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

34. The Company's Board of Directors appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35. Accordingly, each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

36. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

37. The Committee is the Plan Administrator for the Plan. See SPD, at 23 (identifying the Waste Connections, Inc. Investment Committee as the administrator of the Plan).

38. "The Administrator is responsible for the day-to-day administration and operation of the Plan. For example, the Administrator maintains the Plan records, including your account information, provides you with the forms you need to complete for Plan participation, and directs the payment of your account at the appropriate time."). *Id.*, at 22; see also Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6 ("The Investment Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance and reports

to the Plan's Board of Directors."); *id.*, at 7 (The Plan's Investment Committee determines the Plan's valuation policies utilizing information provided by the investment advisers, custodians, and insurance company.").

39. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

40. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS[7]

41. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Waste Connections, Inc. 401(k) Profit Sharing Plan, at any time between March 13, 2020, through the date of judgment (the "Class Period").

42. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 11,557 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the Plan, at 2.

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

43.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company and/or Board failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

45.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

48.    The Plan is a defined contribution plan covering substantially all eligible employees of Waste Connections. *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6 ("The Plan is a defined contribution plan covering employees of Waste Connections, Inc. (the Company) who are not covered by a collective-bargaining agreement or otherwise excluded and have at least 60 days of service."); *see also* Adoption Agreement for Voya Retirement Insurance and Annuity Company Non-Standardized Defined Contribution Pre-Approved Plan ("Plan Doc."), at 2 (identifying the "Type" of plan as a "401(k) Plan.").

49.    Included in the Plan's available funds was a guaranteed investment contract offered by Voya. *See id.*, at 8 ("The Plan has a fully-benefit-responsive group annuity contract (GAC) with Voya Retirement Insurance and Annuity Company (VRIAC). VRIAC maintains the contributions

in a general account. … The guaranteed investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.").

50.    At the end of 2020, $51,727,142 in Plan assets were invested in the Voya GIC. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 15.

51.    At the end of 2024, over $68 million in Plan assets were invested in the Voya GIC. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 12.

52.    The chart below demonstrates the amount of Plan assets invested in the Voya GIC during the Class Period.

| Plan Year | Plan Assets in Voya GIC | Total Amount of Plan Assets | Plan Assets in Voya GIC as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $51,727,142 | $512,465,024 | 10.09% |
| 2021 | $56,146,923 | $608,749,311 | 9.22% |
| 2022 | $60,371,525 | $552,028,840 | 10.94% |
| 2023 | $61,204,466 | $684,026,629 | 8.95% |
| 2024 | $68,019,497 | $799,348,558 | 8.51% |

*Contributions*

53.    "Each year, participants may contribute up to 100 percent of pretax annual compensation, as defined in the Plan." Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6.

54.    "Participants direct the investment of their contributions into various investment options offered by the Plan." *Id*.

55.    "The Company contributes 100 percent of the first 5 percent of eligible compensation that a participant contributes to the Plan." *Id*.; see also SPD, at 5 ("Employer will

13

make a safe harbor matching contribution equal to 100% of your salary deferrals that do not exceed 5% of your compensation.").

56.     Eligible employees may elect to make contributions to their Plan accounts and receive company matching contributions. *See id.* ("You will become eligible to make Elective Deferral Contributions and Voluntary Contributions and receive Employer Matching Contributions on the date you attain age 18, provided that you are an Eligible Employee on that date.").

57.     Participants were also eligible to receive non-elective contributions to their Plan accounts. *See id.* ("You will become a Participant with respect to Non-Elective Contributions on the date you attain age 18 and you complete 3 months of service, provided that you are an Eligible Employee at the end of that period.")

58.     Like other companies that sponsor 401(k) plans for their employees, Waste Connections enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

59.     Waste Connections also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See*, https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

60.     Given the size of the Plan, Waste Connections likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE VOYA GIC IN A PRUDENT MANNER

### A.    The Voya GIC in the Plan

61.    As indicated above, the Plan was invested in the Voya GIC, a proprietary stable value fund managed by Voya.[9]

62.    A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[10]

63.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[11]

64.    The Voya GIC is thus a contract and not a mutual fund investment.  To be sure, there are important differences between a mutual fund and stable value fund.  Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

---

[9] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[10] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[11] *Id.*

65. There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Voya GIC; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

66. Here, the Voya GIC is "a fully-benefit-responsive group annuity contract (GAC) with Voya Retirement Insurance and Annuity Company (VRIAC). VRIAC maintains the contributions in a general account. The account is credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. The GAC is included in the financial statements at contract value as reported to the Plan by VRIAC. The contract value represents the principal balance plus contributions, earnings, and interest, less participant withdrawals and administrative expenses." Auditor's Reports, attached to 2024 Form 5500s for the Plan, at 8.

67. The Auditors' Report attached to the 2024 Form 5500 for the Plan states as follows:

> ***The Plan has a fully-benefit-responsive group annuity contract (GAC) with Voya Retirement Insurance and Annuity Company (VRIAC)***. VRIAC maintains the contributions in a general account. The account is credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. The GAC is included in the financial statements at contract value as reported to the Plan by VRIAC. The contract value represents the principal balance plus contributions, earnings, and interest, less participant withdrawals and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment in the GAC. ***The guaranteed investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.***
>
> There are no reserves against contract value for credit risk of the contract issuer or otherwise. ***The crediting interest rate is based on a formula agreed upon with the issuer, but it may not be less than 0 percent. Such interest rates are reviewed on a quarterly basis for resetting***. Certain events limit the ability of the Plan to transact at contract value with the issuer. Such events include the following: (1) amendments to the plan document (including complete or partial plan termination or merger with another plan); (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions; (3) bankruptcy of the Plan

16

Sponsor or other Plan Sponsor events (for example, divestitures or spin-off of a subsidiary) that cause significant withdrawal from the Plan; or (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA. ***The plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring.***

Auditors' Report attached to the 2024 Form 5500 for the Plan, at 8 (emphasis added).

68.    Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

69.    For the above reasons, the Voya GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Voya GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Voya GIC, therein making stated risk considerations equivalent.

70.    As discussed below, Defendants' selection of the imprudent Voya GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**B.    Defendants Failed ERISA's High Standards Regarding Process and Methodology for Evaluating Investments**

71.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

72.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

17

2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

73.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

74.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[12]

75.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available    at    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

76.    Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test

---

[12] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

the market by, among other things, issuing requests for information and proposals from competing GIC providers.

77.     In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.

78.     The Plan only offers one stable value product. Participants wishing to invest in a stable value product in the Plan have no choice other than the Voya GIC.

79.     Accordingly, the measurement of stable value funds, and specifically the Voya GIC, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

80.     Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[13]

81.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

82.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

83.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

---

[13] *See* https://www,investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

84.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

85.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

86.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on October 29, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

87.     By letter dated January 9, 2026, the Plan's administrator responded to Plaintiffs' request. No meeting minutes or investment policy statements,[14] to the extent they exist, were

---

[14] Failure to provide Plan documents within thirty days of request is a violation of 29 U.S.C. § 1132(c)(1) and 29 U.S.C. § 1024(b)(4). Plaintiffs reserve the right to amend the instant Complaint to add a count for violation of the forgoing ERISA provisions.

produced in response to Plaintiffs' request. Nor was the investment management contract for the Voya GIC provided.

88.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

89.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

90.    In particular, Defendants failed to prudently monitor the Voya GIC, by among other things, determining readily available alternative stable value funds to replace the imprudent Voya GIC.

91.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Voya GIC in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**C.    The Voya GIC Materially Underperformed Relative to Comparator Stable Value Fund GICs**

92.    Selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid

21

proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

93.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

94.    The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Voya GIC's rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

95.    If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

96.    The terms of the Voya GIC allow for this action. The Voya GIC provides a guaranteed interest rate that is guaranteed for a three-month period before it is reviewed for resetting.[15] So at a minimum, every three months during the Class Period, Defendants had an opportunity to rectify their imprudent conduct and select another GIC with higher crediting rates. Moreover, the terms of the Voya GIC contract allowed Plan participants to withdraw their investments at full value[16] to invest elsewhere, like a prudent GIC alternative, if that choice had been made available to them by the Plan's fiduciaries.

---

[15] *See* Auditor's Reports, attached to 2024 Form 5500 for the Plan, at 8 ("The crediting interest rate is based on a formula agreed upon with the issuer, but it may not be less than 0 percent. Such interest rates are reviewed on a quarterly basis for resetting.").

[16] *See id*. ("Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment in the [Voya GIC].").

22

97. As stated above, the Voya GIC's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, the Voya GIC's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Voya GIC, therein making risk considerations equivalent.

98. The Comparator GICs below meet these requirements. Importantly, the Voya GIC had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

99. Defendants' selection of the imprudent Voya GIC was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1. There are Many GICs in the Marketplace with Competitive Crediting Rates

100. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

101. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

102. The Comparator GICs (defined below) were offered in other defined contribution plans, like the Plan, and bore no characteristics that would make them ineligible for inclusion in

the Plan. Thus, the Comparator GICs were clearly available to be selected by the Plan's fiduciaries.

103. As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Voya GIC, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id.* Like the Voya GIC, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id.*

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id.* Like the Voya GIC, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants. *Id.*

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id.*, at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id.* Like the Voya GIC, "[t]he Company does not believe that the occurrence of any such

24

events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 9.

104.    Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator GICs."

105.    The Voya GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

106.    The Voya GIC's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

   a.    **The Voya GIC performed poorly when compared to the Comparator Funds at the Start of the Class Period**

107.    In 2020, the Comparator GICs performed much better than the Voya GIC. Specifically, the Comparator Funds had an average calculated crediting rate of 3.42%. The calculated crediting rate for the Voya GIC was 1.26% in 2020.

108.    The table below demonstrates the underperformance of the Voya GIC compared to the Comparator Funds.

25

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[17] |
|------|-----------|---------------------|-------------|-------------------|-----------------|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Waste Connections Plan** | **9,318** | **$512,465,024** | **Voya** | **1.26%** |

109.    In 2020, Voya GIC underperformed the Comparator GICs by 63.14%.

110.    Additionally, the Voya GIC underperformed other GICs with similar characteristics as the Voya GIC in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |

---

[17] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Waste Connections Plan** | **9,318** | **$512,465,024** | **Voya** | **1.26%** |

### b.    The Voya GIC's Poor Performance Continued through 2021

111.    As demonstrated in the table below, the Voya GIC's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **Waste Connections Plan** | **10,114** | **$608,749,311** | **Voya** | **1.20%** |

112.   In 2021, the Voya GIC underperformed the Comparator GICs by 63.90%.

113.   Additionally, the Voya GIC underperformed other GICs with similar characteristics as the Voya GIC in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Waste Connections Plan** | **10,114** | **$608,749,311** | **Voya** | **1.20%** |

c.   **The Comparator Funds Outperformed the Voya GIC in 2022**

114.   As demonstrated in the table below, the Voya GIC's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |

28

| | | | | | |
|---|---|---|---|---|---|
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **Waste Connections Plan** | **10,870** | **$552,028,840** | **Voya** | **1.22%** |

115.    In 2022, the Voya GIC underperformed the Comparator GICs by 64.20%.

116.    Additionally, the Voya GIC underperformed other GICs with similar characteristics as the Voya GIC in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

| | | | | |
|---|---|---|---|---|
| Allina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| **Waste Connections Plan** | **10,870** | **$552,028,840** | **Voya** | **1.22%** |

### d.    The Voya GIC's Poor Performance Continued through 2023

117.    As demonstrated in the table below, the Voya GIC's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **Waste Connections Plan** | **11,150** | **$684,026,629** | **Voya** | **1.53%** |

118.    In 2023, the Voya GIC underperformed the Comparator GICs by 60.42%.

119.    Additionally, the Voya GIC underperformed other GICs with similar characteristics as Voya GIC in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Waste Connections Plan** | **11,150** | **$684,026,629** | **Voya** | **1.53%** |

### e.    The Comparator Funds Outperformed the Voya GIC in 2024

120.    In 2024, the Comparator Fund outperformed the Voya GIC.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |

| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
|---|---|---|---|---|---|
| | **Waste Connections Plan** | **11,557** | **$799,348,558** | **Voya** | **2.10%** |

121.    In 2024, the Voya GIC underperformed the Comparator GICs by 46.89%.

122.    Additionally, the Voya GIC underperformed other GICs with similar characteristics as the Voya GIC in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **Waste Connections Plan** | **11,557** | **$799,348,558** | **Voya** | **2.10%** |

123.    Throughout the Class Period, the Voya GIC underperformed the Comparator Funds by an average of over 59%, as demonstrated in the table below.

32

| Year | Voya GIC Rate of Return in the Plan | Comparator GIC Average Rate of Return | Voya GIC Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.26% | 3.42% | 63.14% |
| 2021 | 1.20% | 3.32% | 63.90% |
| 2022 | 1.68% | 3.41% | 64.20% |
| 2023 | 2.05% | 3.87% | 60.42% |
| 2024 | 2.24% | 3.95% | 46.89% |
| Average Underperformance during Class Period | | | 59.71% |

124.    The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Voya GIC's dismal crediting rate.

125.    Again, the specific Comparator Funds used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive.

126.    In short, because the Plan held over $500 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

127.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Voya and other providers of stable value investments.

128.    There is one more noteworthy benchmark to consider.  According to an article by the Stable Value Institute of America ("SVIA"), "[t[he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million

participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[18]

129.    Here, from 2020 to 2024 the Comparator GICs had an average return of 3.59%. Thus, the average returns for the Comparator GICs for this time period is a relatively conservative return compared to the 4.1% returns observed by the SVIA.  Yet, even while conservative, the Comparator GIC's average returns were higher than the Voya GIC's average returns.

130.    The Voya GIC had an average return of 1.69% from 2020 to 2024.  This was nearly 60% less than the 4.1% returns the SVIA cited for 42 million participants.

131.    Thus, by selecting the Voya GIC with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

132.    With the significant amount of assets under management in the Voya GIC, the losses suffered by Plan participants were devastating, costing the Plan and its participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[19]

133.    In sum, the Voya GIC in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared

---

[18] *See* "Retirement Plans and Stable Value: By  the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited March 9, 2026)

[19] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

134.    Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the Voya GIC required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers.  All of which they failed to do.

## VII.    DEFENDANTS COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS

135.    During the Class Period, Defendants entered into a contract with Voya to provide, among other things, RKA services. However, such engagements and subsequent services provided by Voya constitute prohibited transactions under ERISA.

136.    29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

137.    Here, Voya was a party in interest to the Plan as it was receiving compensation for RKA services, as well as compensation from trustee services from the Plan. Voya was also a party in interest as it was receiving compensation for managing/maintaining the Plan's investments in Voya's funds.

### A.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

138.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and

35

administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

139.    There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.    Multi-channel participant and plan sponsor access (e.g. phone, web);

C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

      J.     Plan consulting (e.g. preapproved document services, operational compliance support).

140. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

141. The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

      a.     Loan processing;

      b.     Brokerage services/account maintenance (if offered by the plan);

      c.     Distribution services; and

      d.     Processing of qualified domestic relations orders.

142. All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

143.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper *notwithstanding the level, number and character of the services provided to that additional participant*.

144.    Recordkeepers such as Principal, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (e.g., website, call center, and some print services).

145.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**B.    The Plan's Recordkeeping Fees to Principal were Excessive**

146.    As demonstrated in the tables below, the Plan's participants were saddled with above-market administrative and recordkeeping fees during the Class Period.

147.    The Plan's per participant RKA fees were as follows:

| Plan Year | Recordkeeper | Participants | Total RKA Reported | PP$ |
|---|---|---|---|---|
| 2020 | Voya | 9,318 | $507,792 | $54.50 |
| 2021 | Voya | 10,114 | $558,433 | $55.21 |
| 2022 | Voya | 10,870 | $814,030 | $74.89 |
| 2023 | Voya | 11,150 | $785,910 | $70.49 |
| 2024 | Voya | 11,557 | $869,761 | $75.26 |

148.    Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

38

| Plan Year | Plan Name | Recordkeeper | Assets Under Management | Participants | Schedule C Codes | Cost Per Participant[20] |
|---|---|---|---|---|---|---|
| 2020 | Johnson Brothers 401(k) Plan | Wells Fargo | $236,760,533 | 3,655 | 15 21 37 50 62 64 | $49 |
| 2020 | Refinitiv 401(k) Savings Plan | Voya | $1,013,607,858 | 3,795 | 37 64 | $38 |
| 2020 | Evoqua Water Technologies LLC Savings Plan | Schwab | $507,272,363 | 3,940 | 15 50 64 | $54 |
| 2020 | Morningstar, Inc. 401(k) Plan | Schwab | $681,973,580 | 3,950 | 15 50 64 | $47 |
| 2020 | Ceridian Savings and Investment Plan | T.Rowe Price | $591,489,462 | 3,200 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | $48 |
| 2020 | Optumcare Management, LLC 401(k) Retirement Savings Plan | Fidelity | $938,281,291 | 9,832 | 37 60 64 65 71 | $19 |
| **2020** | **Waste Connections Plan** | **Voya** | **$512,465,024** | **9,318** | **26 64** | **$55** |
| 2021 | Meriter 401(k) Plan | Fidelity | $300,507,455 | 4,155 | 37 60 64 65 | $45 |
| 2021 | Hallmark Affiliates Employee Savings Plan | Great-West | $459,563,415 | 3,286 | 15 37 50 64 | $51 |
| 2021 | Enloe Medical Center Defined Contribution Retirement Plan | Fidelity | $219,896,932 | 3,677 | 60 64 65 | $43 |
| 2021 | Protective Life Corporation 401(k) Plan | Fidelity | $602,700,167 | 4,026 | 37 60 64 65 | $58 |
| 2021 | Evoqua Water Technologies LLC Savings Plan | Schwab | $558,545,953 | 4,000 | 15 50 64 | $56 |
| 2021 | Crowe LLP Retirement Plan | Vanguard | $1,021,351,197 | 6,840 | 15 33 37 99 | $27 |
| **2021** | **Waste Connections Plan** | **Voya** | **$684,026,629** | **10,114** | **26 64** | **$55** |
| 2022 | Hilti Retirement Savings Plan | Prudential | $523,145,772 | 4,424 | 12 13 15 27 37 50 64 | $29 |
| 2022 | Evoqua Water Technologies LLC Savings Plan | Schwab | $483,045,970 | 4,506 | 15 50 64 | $55 |
| 2022 | EPAM Systems, Inc. 401(k) Plan | Fidelity | $258,731,389 | 4,310 | 37 60 64 65 71 | $60 |
| 2022 | Clark Group Retirement Plan | Vanguard | $768,749,338 | 4,354 | 15 16 25 37 52 | $57 |

---

[20] Unless otherwise noted, these fees are taken from the Form 5500s.

| | | | | | | |
|---|---|---|---|---|---|---|
| 2022 | Modine Manufacturing Company 401(k) Retirement Plan | Principal Life | $301,865,642 | 4,230 | 13 15 37 50 64 | $50 |
| 2022 | Crowe LLP Retirement Plan | Vanguard | $992,984,046 | 7,584 | 15 33 37 99 | $26 |
| 2022 | Vista Outdoor Inc. 401(k) Plan | Vanguard | $440,444,788 | 7,295 | 15 16 33 37 38 99 | $33 |
| **2022** | **Waste Connections Plan** | **Voya** | **$552,028,840** | **10,870** | **26 64** | **$75** |
| 2023 | Omnicell, Inc. 401(k) Plan | Fidelity | $361,735,651 | 4,067 | 37 60 64 65 | $52 |
| 2023 | Axalta Coating Systems, LLC Retirement Savings Plan | Vanguard | $527,986,318 | 3,995 | 15 16 25 37 52 99 | $52 |
| 2023 | Marelli North America, Inc. 401(k) Retirement Plan | Fidelity | $203,248,425 | 3,043 | 37 60 64 65 71 | $39 |
| 2023 | BRFHH Retirement Plan | Vanguard | $150,012,652 | 4,017 | 15 16 25 37 52 | $56 |
| 2023 | Triniplus Retirement Plan | Transamerica | $388,641,880 | 3,795 | 12 15 28 37 38 50 54 59 61 62 63 64 65 | $51 |
| 2023 | Crowe LLP Retirement Plan | Vanguard | $992,984,046 | 7,992 | 15 33 37 99 | $26 |
| **2023** | **Waste Connections Plan** | **Voya** | **$684,026,629** | **11,150** | **26 64** | **$70** |
| 2024 | Maplebear Inc. d/b/a Instacart Retirement Plan | Fidelity | $297,040,898 | 3,473 | 37 60 64 65 71 | $31 |
| 2024 | LG Electronics Retirement Plan | Fidelity | $450,379,425 | 3,655 | 37 60 64 65 71 | $55 |
| 2024 | Muckleshoot Retirement Plan | Fidelity | $260,032,995 | 4,486 | 37 60 64 65 | $59 |
| 2024 | Steel Partners 401(k) Savings Plan | Fidelity | $287,412,653 | 3,074 | 37 60 64 65 | $35 |
| 2024 | Bose Employees' Retirement Savings 401(k) Plan | Empower | $680,910,797 | 3,848 | 15 37 50 64 | $29 |
| 2024 | Crowe LLP Retirement Plan | Vanguard | $1,265,316,102 | 7,934 | 15 33 37 99 | $21 |
| **2024** | **Waste Connections Plan** | **Voya** | **$799,348,558** | **11,557** | **64** | **$75** |

149.    The above table demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees during the Class Period.

150.    The Plan's $66 average per participant fee from 2020 to 2024 is more than twenty dollars above the average fee of $44 per participant from 2020 to 2024 for the thirty-one (31) plans listed above.

151.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2020 through 2024. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees during the Class Period.

152.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $44 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

153.    Because Principal was a party-in-interest, the Plan's fiduciaries should have taken the additional sources of income paid to Voya into consideration to reduce the excessive RKA fees paid to Voya.

154.    For the foregoing reasons, Defendants' violation of ERISA's prohibited transactions resulted in Plan participants paying excessive RKA fees to Voya.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee)

155.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

156.    At all relevant times, the Committee, and their members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A),

in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

157.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

158.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Voya GIC based solely on the merits of the investment and what was in the best interest of Plan's participants. Instead, the Prudence Defendants selected and retained the Voya GIC in the Plan despite poor performance in relation to other comparable investments.

159.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Voya GIC, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

160.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

161.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company and the Board)**

162.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

163.    Voya, and its Board, (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee. Monitoring Defendants were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

164.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

165.    The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company and the Board.

166.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

167.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

168.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT III
### Prohibited Transaction With Respect to the Voya GIC
### (against all Defendants)

169.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

170.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

171.    Defendants were at all times fiduciaries to the Plan.

172.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

44

173. Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Voya.

174. Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Voya and the Plan.

175. When Defendants caused the Plan to engage in the annuity transaction, Voya was a party in interest because, *inter alia*, Voya, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

176. These transactions occurred each time the Plan paid fees to Voya in connection with the Plan's investments in the Voya GIC and other proprietary options that paid revenue sharing to Voya.

177. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**COUNT III**
**Prohibited Transaction With Respect to RKA**
**(against all Defendants)**

178. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

179. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods,

45

services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

180.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

181.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

182.    Defendants' decision to agree to pay excessive fees to Voya as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

183.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment

47

of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's

fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: March 13, 2026                    Respectfully submitted,

*Daniel L. White*
Daniel L. White, Esquire
TX Attorney ID #24090588
**WARD + WHITE PLLC**
14 ½ E. Louisianna Street
Suite 206
McKinney, TX  75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

Mark K. Gyandoh, Esquire
PA Attorney ID #88587
James A. Maro, Esquire
PA Attorney ID #86420
(*Pro Hac Vice* to be Requested*)*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel.: (610) 890-0200
Email: markg@capozziadler.com
         jamesm@capozziadler.com

*Counsel for Plaintiffs and the Putative Class*